Verdict for the defendant.

## Case No. 17,540.

### WHITE v. CLARKE et al.

[5 Cranch, C. C. 102.] [1]

Circuit Court, District of Columbia. June 10, 1837.[2]

EQUITY JURISDICTION—SURRENDER OF NEGOTIABLE PAPER—PAYMENT IN GOODS—INSOLVENCY —COMPROMISE CONTRACTS.

1. Courts of equity have jurisdiction to decree the surrender of negotiable notes, unconscientiously withheld by the defendant.

2. If goods be sold at an abatement of five per cent. from the invoice price, upon the vendee's assurance that the notes given by him therefor should be punctually paid, and he suffers one of them to be protested, and the vendor afterwards receives goods for his claim, at seventy per cent., the seventy per cent. is to be calculated upon the amount due upon the notes, and not upon the full invoice price.

3. The rule that if a debtor, in compounding with his creditors, secretly promises to give to one more than to the others, in order to induce him to sign the instrument of composition, it is void, only applies to cases where the creditors are supposed mutually to agree with each other, as well as with the debtor. But when each creditor is separately compounded with, this principle of mutuality and equality does not apply.

4. Each creditor has a right to make his own bargain with his debtor, and one bargain cannot be void because it is better than another.

5. A fraud in another transaction between the complainant and others, not parties to the cause, cannot invalidate the transaction between the parties to the suit before the court.

The bill in equity in this case states that on the 2d of July, 1832, the complainant passed to the defendants his twenty-six promissory notes of that date, each for $274.67, payable to them at different times, from sixteen to forty-four months, amounting to $7,141.42, three of which notes had been passed away by the defendants to Clagett & Washington; that on the 30th of December, 1833, he entered into an agreement with the defendants, to anticipate the payment of those notes, and to deliver to them, and they agreed to receive of the complainant, goods in his store, "in full payment of the said sum of money, at the rate of seventy cents in the dollar on the price the said goods and merchandise were marked to have cost; and the said Clarke and Briscoe did further agree to deliver to your

1 [Reported by Hon. William Cranch, Chief Judge.]

1 [Reported by Hon. William Cranch, Chief Judge.]

2 [Affirmed in 12 Pet. (37 U. S.) 178.]

orator, to be cancelled, on the delivery of the said goods and merchandise, all the said promissory notes then in their possession, and speedily to pay and take up such of the said notes as had then been negotiated and were in the hands of other persons, and to deliver them to your orator in like manner to be cancelled." That the complainant fulfilled the agreement on his part, in every particular, and delivered the goods to the full amount, except a fraction of $1.41, in payment of the said sum of $7,141.42 at the rate of seventy cents in the dollar on the prime and marked cost of the said goods and merchandise, which they accepted, on the terms of the said agreement, in satisfaction and payment of the said sum of money, without objection known to the complainant, who has tendered to deliver, and is ready to deliver to them goods and merchandise to the value of $1.41. That the complainant has demanded the notes which the defendants refuse to deliver up to be cancelled, &c. It then prays the court to order the defendants to bring the notes into court; and to pay the notes held by Clagett & Washington; and for general relief.

The answer of the defendants states that the consideration of the notes was the sale of a large invoice of goods by them to the complainant from which they agreed to deduct five per cent. in consideration of his solemn promise that the notes should be punctually paid. They deny that they made the agreement respecting the compromise of their claim, and the cancelling of their notes, in the terms and upon the conditions set forth in the bill. But they aver that about the time mentioned in the bill, in consequence of hearing that the complainant had failed in business and was compromising with his creditors, a conversation and arrangement did take place between the defendant Clarke and the complainant, in which the said defendant asked him upon what terms he would settle the whole claim of the defendants; not merely on what terms he would settle the amount of the said notes. The complainant offered sixty cents in the dollar payable in goods; but upon the said defendants' saying that they understood that he had compromised with other creditors at seventy, he agreed to pay the defendants in goods the whole amount of their claim at the rate of seventy cents in the dollar; and pay the difference, namely, thirty cents when he was able; and it was not till after the said arrangement had been so agreed upon that any thing was said between them about the defendants' getting up and cancelling the complainant's notes; but it was afterwards arranged between them that upon the settlement of the defendants' whole claim by paying the same in goods at the rate of seventy cents in the dollar, the defendants should get in and cancel the said notes; not upon the settlement, in that mode, of the amount of the notes merely; such was not the understanding of the defendants; but the amount understood by Clarke, at the time, was the amount of the original invoice from which five per cent. had been deducted when the notes were given upon the assurance of the complainant that the notes should be punctually paid; and as the complainant had failed totally to comply with that assurance the defendants considered that in equity and strict justice they were entitled to the amount of the invoice without such deduction. That the complainant had not complied substantially or otherwise with the terms of the said compromise, in the sense in which it was properly understood and agreed as aforesaid, so as to entitle him to call in the said notes in consideration of goods delivered by him in consequence of such compromise. That according to such compromise, in the terms in which it was made and understood on the part of the defendants, the notes were to be got in and cancelled upon the entire settlement of the defendants' said claim, and not otherwise; especially not upon the liquidation, at the rate aforesaid, of the mere amount of the notes. That the said terms have not been complied with on the part of the complainant, and he has refused to comply with the same, having delivered goods only to the amount stated in his bill, refusing to deliver goods to the amount of the goods originally delivered to him by the defendants without said deduction.

The defendants complain that a great part of the goods were remnants, and that it was a hard compromise on their part if it had been complied with. But they allege that it was not binding on them because obtained by fraud practised by the complainant upon the defendants and other creditors of the complainant, in order to alarm them into a compromise. That the whole matter of his pretended failure was a deliberate, artful, and fraudulent scheme of the complainant, to alarm and force his creditors into compromises, while, in fact, he was possessed of ample means to pay off all his debts and have a surplus on hand; that with such ample means in his hands, and with a fraudulent design to conceal and appropriate the same to his own illicit and fraudulent gains, he proclaimed his own failure and insolvency, and went about, under the alarm thus communicated to his creditors, and with false representations of his desperate circumstances, to catch up the most advantageous compromises he could with them, one by one; his offers of compromise varying from forty to eighty-seven and a half cents in the dollar, actually effecting compromises with some at the lowest rate, and with others at the highest. That preparatory to this scheme of fraudulent failure, and shortly before it was proclaimed, he had made unusually large purchases on credit, and shortly after gave out his failure in business and insolvency, and set on foot his plan of fraudulent compromises. That it was under the greatest pressure of this alarm, and while it was fraudulently used by the complainant to practise upon the fears of his creditors, that the defendants were fraudu-

lently and deceitfully drawn by him into such agreement for the compromise, as they have stated and admitted; and they believe that his scheme of a pretended and fraudulent failure had been meditated and prepared by the complainant before he made his purchase of the defendants and gave his notes; and that a few days after that transaction, namely, about the 9th of July, 1832, he caused to be entered in the land records of this county a fraudulent deed, settling valuable property on his family, which had been executed in the month of January preceding, and in the mean time kept secret.

To this answer the complainant filed a general replication; and a commission to take depositions was issued, under which sundry depositions were taken, and by consent, all the papers, except the bill and answer, filed in the case of Hall v. White (at December term, 1833), were permitted to be read in evidence in this cause.

At the hearing, W. L. Brent and Mr. Marbury, for the complainant, contended that according to the compromise as proved, the 70 per cent. was to be computed upon the amount of the notes then outstanding, and not upon the invoice price of the goods, and that there was no fraud on the part of the plaintiff in effecting the compromise; and that the notes ought to be delivered up, as the terms of the compromise had been faithfully complied with by the complainant, whether the defendants did or did not expressly promise to give them up. They were negotiable, and the complainant ought not to be kept in fear of being harrassed by them, as he might be if they should be negotiated. That a court of equity has a clear jurisdiction to decree a surrender of them to be cancelled. Hamilton v. Cummings, 1 Johns. Ch. 517. That no objection can arise from the fact that he made better terms with some of his creditors than with others, as each was acting for himself alone.

Mr. Hoban and Mr. Jones, contra, contended that the answer of the defendants, stating the terms of the compromise, being responsive to the statement of the compromise in the bill, is evidence for the defendants, unless contradicted by two witnesses, or by one corroborated by circumstances. That as the abatement of five per cent. from the invoice price was made upon the assurance of the complainant that the notes should be punctually paid; when he failed to pay punctually the defendants were remitted to their original right, and were entitled to the whole invoice price, and were not bound to give up the notes unless that whole price should be paid by the complainant. Sewell v. Musson, 1 Vern. 210; Leigh v. Barry, 3 Atk. 583; MacKenzie v. MacKenzie, 16 Ves. 372; Bennet's Case, 2 Atk. 527. That this court has no jurisdiction to decree a specific execution of a verbal contract relating to personal estate, upon the ground of contract only. Greenwood v. Lidbetter, 12 Price, 183. That the compromise was obtained under fraudulent and false pretences. Pollen v. Huband, 1 P. Wms. 751; Hov. Frauds, 13, 14; Huguenin v. Baseley, 14 Ves. 289; Roche v. O'Brien, 1 Ball. & B. 340; Child v. Danbridge, 2 Vern. 71; Cecil v. Plaistow, 1 Anstr. 202; Mawson v. Stock, 6 Ves. 300; Jackman v. Michell, 13 Ves. 581; Sadler v. Jackson, 15 Ves. 52, 55; Leicester v. Rose, 4 East, 372; Constantein v. Blache, 1 Cox, Ch. 287; Chapple v. Ashley, 1 Dowl. & R. 27; Cockshot v. Bennett, 2 Term R. 763; Fawcett v. Gee, 3 Anstr. 910; Smith v. Cuff, 6 Maule & S. 160; Spooner v. Whiston, 8 Moore, 580; Jackson v. Lomas, 4 Term R. 166; Coleman v. Waller, 3 Younge & J. 212; 1 Story, Eq. Jur. 199, 236, 356, 366.

CRANCH, Chief Judge, after stating the substance of the bill, answer, and evidence, delivered the opinion of the court.

It is contended by the counsel for the defendants that the bill contains no ground for jurisdiction in equity; that courts of equity will not enforce the specific execution of parol agreements respecting personal property; that all the cases in which those courts have decreed the specific performance of agreements respecting chattels, were cases upon written contracts. But in the present case the equity of the complainant does not depend entirely upon the contract, but upon the refusal of the defendants to deliver up negotiable notes which, under the circumstances of the case, they would unconscientiously withhold even if they had not expressly agreed to surrender them. 2 Story, Eq. Jur. p. 22, § 715, and Id., p. 24, § 717. The danger that the defendants might pass them away before maturity, by which the complainant would be deprived of his legal defence, seems to me to be a sufficient ground for the interference of a court of equity. But the jurisdiction of a court of equity to compel the surrender of instruments, especially of negotiable instruments, unconscientiously withheld, seems to be put beyond doubt by Chancellor Kent in Hamilton v. Cummins; and by Mr. Justice Story in his Commentaries on Equity Jurisprudence (volume 2, p. 11, § 700, and Id., p. 15, § 705).

Admitting the jurisdiction, three principal questions arise: 1st. What was the contract of the 30th of December, 1833? 2d. Was it obtained by fraud or imposition practised by the complainant upon the defendants? 3d. If it was a valid contract, has it been complied with on the part of the complainant?

1. What was the contract? The defendants, in their answer admit that, on the 30th of December, 1833, there was an agreement with the complainant for a compromise of their just claim upon him, by which he agreed to pay, and they agreed to receive the whole amount of their claim, at the rate of seventy cents in the dollar, payable in goods in his store; that in consequence of such compromise he delivered to them, and they received, goods to the amount stated in

his bill, (that is, to the amount of the notes, at seventy cents in the dollar, with the exception of a fraction of $1.41, which the complainant avers he was always ready to deliver, &c.) Admitting then (that which the complainant is not bound to admit) namely, that the compromise was upon the terms stated in the answer, the question is, what was the amount of the defendants' just claim against the complainant on the 30th of December, 1833? The forty-four notes were given for the exact amount of the purchase-money of the goods sold by the defendants to the complainant on the 2d of July, 1832. The complainant never owed them a larger sum for those goods. The amount of the notes was the debt, and the whole debt, compounded. The complainant had paid, punctually, the first fifteen notes, each note being for $274.67 amounting to, in all, to $4,-120.25. Three more of the notes had been paid by Mr. Van Ness, amounting to $824.01. The sixteenth note, due November 5th, 1833, had been renewed, by mutual consent, for sixty days. The seventeenth note, due December 5th, 1833, was not paid, and was then lying under protest from the 6th to the 30th of December. But the failure of the complainant to pay that note, at maturity, did not give the defendants any new right, or restore them to any previous right, as in cases of compounding debts. where, if the composition is not punctually paid. the creditor is remitted to his original rights. The remaining notes had time to run, from one to twenty-seven months. The just claim of the defendants, therefore, on the 30th of December, 1833, was not even to the amount due upon the face of the notes; but to that amount, (minus the discount for the time they had to run,) and the interest and cost of protest upon that which became payable on the 5th of December, 1833.

The defendants, in their answer, admit payment of the full amount of the notes, in goods, upon the terms, and at the rates, of the compromise; they have, therefore, received payment, in the stipulated mode, of at least the full amount of their just claim. This is my view, of this part of the case, founded upon the defendants' answer alone; and it is strongly corroborated by the testimony of the witnesses, and by the acts of the defendants themselves.

Mr. Brannan testifies that Mr. Clarke, the defendant, originated the proposition for the compromise: and asked Mr. White. the complainant, how much he would give him for his claim; and that seventy cents in the dollar was agreed upon, to be paid in goods at the marked cost price. It appears from his deposition, and those of James L. White and Cornelius G. Wildman, that before the goods were delivered. the complainant asked Mr. Clarke. who was then in the complainant's shop, for the amount of his claim: to which Mr. Clarke replied. "send in your young man to my store and he will get it."

That Mr. Wildman was, accordingly. immediately sent by Mr. White to the defendant's store for that purpose, and the defendant, Mr. Briscoe, gave him the paper marked "A.," annexed to the complainant's Exhibit No. 1, which is a statement of forty-four notes, from one to forty-four months; for $274.67 each .......................... $12.085.48
Fifteen duly paid, ............ 4.120.05

$7.965.43
Three paid by Van Ness, ........ $24.01

$7,141.42

That Mr. Clarke, the defendant, continued to take goods until his claim was satisfied. And it appears by the deposition of James T. Clark, that an inventory of the goods taken was made at the time and delivered by Mr. Brannan, the complainant's clerk, to the defendants, immediately after the delivery of the goods, to show the amount, and that they might examine it. The inventory is produced and verified by the witness. It amounts to $4.997.58. The amount of the notes, without allowing any discount for the time they had to run, was $7,141.42, which at seventy cents in the dollar is $4,998.99, being $1.41 more than the goods taken.

There is no evidence that the defendants asked to take any thing more, or even suggested that they had any further claim. The transaction itself shows that the complainant understood the amount of the unpaid notes to be the whole amount of the defendants' claim, and that the defendants acquiesced in that understanding. At all events, the admissions of the defendants, in their answer, show that the notes have been satisfied, and therefore they ought, not only according to equity and conscience, but by the express agreement of the defendants, to be given up; unless the agreement for the compromise was obtained by fraud practised by the complainant upon the defendants.

2. Was it thus obtained? The nature of the fraud, alleged in the defendants' answer, is that the complainant, by false representations of his inability to pay all his debts, had induced some of his creditors to compound their claims; that the defendants, hearing reports of such compromises. became alarmed. and under that alarm, willing to secure what they could, agreed to the composition, when, in fact, the complainant was able to pay all his debts. That the complainant took an unconscientious advantage of that alarm, knowing himself to be solvent, and that the defendants believed him to be insolvent. To maintain this defence the defendants must prove, first, the representations; second, that they were false and that the complainant knew that they were false when he made them; third, that such false representations induced some creditor or creditors of the complainant to compound their claims; fourth, that the defendants had

heard of such false representations and composition, and were thereby, or by other false representations of the complainant in relation to his affairs, and his inability to pay all his debts, made to themselves or others, with intent to injure some one, induced to make the compromise; and that the complainant knew, at that time, that the defendants were so induced, and acted under a state of alarm produced by such false representations and information. There is no evidence that the complainant made any representation or pretence of insolvency before the protest of some of his notes in November, 1833; and his letters to A. Hart & Co., of the 30th of October; to Tiffany & Co., of the 14th and 16th of November, and to Hall & Co., of the 21st of November, produced in evidence by the defendants, show an earnest desire on the part of the complainant to prevent those protests, and to maintain his credit. There can hardly be a stronger proof of his sincerity, and of the good faith in which he made his purchases, that fall, than the fact that between the 1st of September and the 6th of December, when his shop was closed by an injunction obtained by his Baltimore creditors, he paid debts, in cash, to the amount of $12,000, as appears by the affidavit and deposition of Mr. Wildman, who exhibits an account of the particular items to which the money was applied.

I have said that there was no evidence that the complainant made any representation or pretence of insolvency before the protest of some of his notes in November; perhaps I ought to have excepted the testimony of Mr. Henry B. Clarke, who says that in the fall of 1833, about three weeks before Mr. White went to New York the first time and made his large purchases, in a conversation between Mr. White and Mr. Briscoe, who was regretting the failure of Mr. Henry Carter, he heard Mr. White remark to Mr. Briscoe, that he had better be sorry for himself, for he, Mr. White knew that "he himself was not able to pay his own debts." What Mr. Briscoe said in reply, the witness does not recollect. Mr. White appeared to be quite serious. The witness afterward, he thinks on the same evening, or shortly after that, heard Mr. Briscoe say that he was fearful of losing the debt due by Mr. White to Clarke and Briscoe. It seems to be very improbable that Mr. White should have said this seriously, with intent to alarm Mr. Briscoe into a compromise, when he was about to go to New York to purchase his fall supply of goods. Mr. Briscoe took no steps, in consequence of it, to get security for the debt. It can scarcely be believed that it caused the compromise of the 30th of December, 1833. Up to the time when the complainant's storehouse was shut up by the injunction on the 6th of December, there had been nothing in the complainant's conduct or conversation to excite alarm, except the protest of one or two of his notes, and an application to some of his creditors for an extension of time. This is testified by Mr. James L. White, and corroborated by Mr. Brannan and Mr. Wildman. There is no evidence of any assertion or pretence of insolvency by Mr. White until after his Baltimore creditors or some of them as agents of the others, came here and in a manner compelled him to give them a statement of his affairs, which, when made, showed that he was unable to pay all his debts. His Baltimore creditors then charged him with fraudulently obtaining their goods, under pretence of being solvent when he knew himself to be insolvent; and, upon the idea that the sales to him were void by reason of the fraud, and the right of property not changed, although so mingled with other goods that they could not be replevied at law, they filed a bill in chancery and obtained an injunction to prevent the then defendant but now complainant from selling or removing the goods until the further order of the court. This injunction remained until the 26th of December, 1833, when it was dissolved on affidavits.

There is no evidence of any thing said or done by the complainant in order to excite alarm among his creditors. I deem it unnecessary in this case to inquire whether the complainant in making his purchases in the fall of 1833, intended to defraud those vendors. The purchase made by the complainant of the defendants' goods, was in July, 1832, and in no manner connected with the purchases made by the complainant in 1833. The alleged ground of fraud in the one case is exactly the reverse of that alleged in the other. The purchases in 1833 were said to be fraudulent because the complainant represented himself to be solvent when he knew himself to be insolvent. The charge in the present case is, that he represented himself to be insolvent when he knew himself to be solvent. They have, in fact, no relation to each other. The authorities cited to show, that if a debtor, in compounding with his creditors, secretly promises to give to one, more than to the others, in order to induce him to sign the instrument of composition, it is void, are only applicable to cases where the creditors are supposed mutually to agree with each other, as well as with the debtor. But where each creditor is separately compounded with, this principle of mutuality and equality does not apply. Each creditor has a right to make his own bargain with his debtor; and one bargain cannot be void because it is better than another. The purchase of a lot in the name of his children and building a house upon it, if he was solvent at the time, would not be even a technical fraud upon his creditors; but if he was not solvent, it would be only a technical fraud, which would be set aside in favor of creditors only, or subsequent purchasers. A copy of the deed is not produced in evidence, but it is said that it re-

cites that the purchase-money belonged to his children, and there is no evidence to contradict the recital. If the deed is offered in evidence it must be taken altogether, and the burden of proof is on the defendants to contradict any part of it. It was made in January, 1832, nearly two years before the compromise; and even if it was fraudulent, it is no way connected with the compromise. It was registered in July, 1832, and any one interested might at any time have had access to the record.

It is very natural to suppose that the heavy charges of fraud made against the complainant by his Baltimore creditors in the beginning of December, 1833, and the severe proceedings they instituted against him; the sequestration of his whole stock in trade, and the total suspension of his business by the injunction, were sufficient, of themselves, to cause the alarm. under which the defendants, as soon as the injunction was dissolved, (which was on the 26th of December,) sought a compromise by a payment in the goods which had thus, as to them, been put in jeopardy. There is no evidence to show that that alarm had been voluntarily created by the complainant, and the defendants seem to have been content with their share in the scramble which followed the removal of the injunction. Every one was, no doubt, anxious to save all he could from the wreck; and the subsequent settlement with other creditors, at fifty cents in the dollar, only shows that the defendants, in getting seventy, fared better than some of their neighbors. The notes. excepting that which fell due 2d–5th of December, were not payable, having time to run, from one to twenty-seven months, without interest; the immediate payment, therefore, especially in the precarious state of the complainant's affairs, was a good and valuable consideration for the discount which was agreed upon. Looking upon this compromise, therefore, in every point of view, it seems to me to have been a fair and valid contract, which ought to be executed by both parties in good faith.

3. The third question. then, is, has it been complied with on the part of the complainant? The defendants admit, in their answer, that it has been complied with on his part to the extent of the notes. Being of opinion that the amount due upon the notes constituted the whole just claim of the defendants; and there being no evidence that at the time of the agreement for the compromise, and at the time of the execution of that compromise by the delivery of the goods, they intimated any further claim, I must say that, in my opinion. the complainant has fairly and fully complied with the terms of the contract, and that the defendants ought to deliver up all the notes to be cancelled.

MORSELL. Circuit Judge, concurred.
THRUSTON, Circuit Judge, dissented.

The decree was entered up on the 10th of June, 1837, and was, in substance, that the injunction should be perpetual to prevent the defendants from negotiating the notes; that the defendants should bring them into court to be cancelled, and that they should pay the complainant $1,083.55, being the amount paid by the complainant on judgments obtained against him upon three of the notes which the defendants had passed away, with interest thereon from the date of the decree.

From this decree the defendants appealed to the supreme court of the United States. where it was affirmed in February, 1838. 12 Pet. [37 U. S.] 178.